| ¶ PEATROSS, J.
In this action for paternity and child support, Defendant, Ira L. Gibson, appeals the decision of the trial court finding that he is the biological and natural father of the minor child, J.J.A. For the reasons stated herein, we affirm.

FACTS

In 1987, Rosalyn Atkins and Ira Gibson began a dating relationship. Mr. Gibson resided in Monroe, but was in the Air Force Reserve which required that he spend time in Shreveport. When Mr. Gibson was in Shreveport, he maintained the dating relationship with Ms. Atkins. Both Mr. Gibson and Ms. Atkins testified at trial that they had sexual intercourse, off and on, from 1987 into January and February of 1992. In February 1992, Ms. Atkins became pregnant. The evidence indicates that she carried the baby to full term; and, on November 3, 1992, J.J.A. was born. Mr. Gibson was not informed of the child’s birth and did not visit Ms. Atkins and J.J.A. in the hospital. There is also some dispute as to whether or not Ms. Atkins advised Mr. Gibson that she believed he was J.J.A.’s father prior to the initiation of the paternity proceedings. Ms. Atkins admits that it was not until J.J.A. was five to six months old that she told Mr. Gibson that he was J.J.A.’s father; however, Mr. Gibson maintains that, while he knew that Ms. Atkins had become pregnant, he was unaware that he might be the father of the child until he was served with the State’s petition in this case.
On February 27, 1996, the State of Louisiana filed suit against Mr. Gibson to establish paternity and for child support. Mr. Gibson filed an answer denying paternity of the child. The trial court ordered blood tests pursuant to La. R.S. 9:396; however, finding procedural flaws (an error in the notarized affidavits) in the first round of tests, the trial court ordered additional testing to be done. After the second round of tests was complete, on April 16, 1999, a trial was conducted at which the results of the tests were introduced. The test results | ¡.revealed that Mr. Gibson could not be excluded as the father of J.J.A. and established a probability of paternity of 99.99997 percent. The results also indicated a combined paternity index of 3510000.
At trial, in addition to the test results, the State presented the testimony of Dr. Amanda Sozer of Fairfax Identity Laboratory, an expert in paternity genetics and evaluations; Ms. Atkins; and Charlotte Rougley, a close friend of Ms. Atkins. Dr. Sozer testified regarding DNA paternity testing in general and testing procedures and explained the test results in this particular case. Ms. Atkins testified that Mr. Gibson was the only individual with whom she had sexual intercourse during February of 1992. Ms. Rougley also testified that, according to what Ms. Atkins had told her, Mr. Gibson was the only person with wThom Ms. Atkins had a sexual relationship at the time J.J.A. was conceived and that he was the child’s father.
Mr. Gibson testified on his own behalf and admitted to having sexual intercourse with Ms. Atkins during February, but stated that the encounter was at the end of the month. In support, Mr. Gibson introduced a military-type document indicating that he was in Shreveport for Air Force Reserve matters on February 28, 1992, which is the date on which he admits he had sexual intercourse with Ms. Atkins. According to Mr. Gibson, counting back from the birth of the child at full term, conception would have occurred in the first week of February; and, since he was not in Shreveport during that time, he cannot be the father.
After hearing the above testimony, the trial court ruled that Mr. Gibson was the *717 natural and biological father of J.J.A. and a judgment to that effect was rendered on July 22, 1999. The issue of child support was heard on August 6, 1999, at which time Mr. Gibson was ordered to pay $503.10 per month, plus a five percent administrative fee, for a total monthly payment of $528.25. The child support was made retroactive to the date of the filing of the petition creating an arrearage of $21,-633.30, plus the five percent fee, for a total | ^arrearage due of $22,714.96. Mr. Gibson appeals the determination of paternity only.

DISCUSSION

Challenge to Blood Test Results

This appeal concerns interpretation and application of La. R.S. 9:397.3, which reads as follows:
§ 397.3. Admissibility and effect of test results
A.(1) A written report of the results of the initial testing, certified by a sworn affidavit by the expert who supervised the tests, shall be filed in the suit record. The affidavit shall state in substance:
(a) That the affiant is qualified as an examiner of blood or tissue samples for inherited characteristics, including but not limited to blood and tissue types, to administer the test and shall give the affiant’s name, address, telephone number, qualifications, education, and experience.
(b) How the tested individuals were identified when the samples were obtained.
(c) Who obtained the samples and how, when, and where the samples were obtained.
(d) The chain of custody of the samples from the time obtained until the tests were completed.
(e) The results of the test and the probability of paternity as calculated by an expert based on the test results.
(f)The procedures performed to obtain the test results.
(2) A notice that the report has been filed shall be mailed by certified mail to all parties by the clerk of court or shall be served in accordance with Code of Civil Procedure Article 1314.
(3) A party may challenge the testing procedure within thirty days of the date of receipt or service of the notice.
B. (1) If the court finds there has been a procedural error in the administration of the tests, the court shall order an additional test made by the same laboratory or expert.
(2) (a) If there is no timely challenge to the testing ^procedure or if the court finds there has been no procedural error in the testing procedure, the certified report shall be admitted in evidence at trial as pri-ma facie proof of its contents, provided that the party against whom the report is sought to be used may summon and examine those making the original of the report as witnesses under cross-examination. The summons for the individual making the original of the report may be served through his employer’s agent for service of process listed with the secretary of state or served pursuant to R.S. 13:3201 et seq.
(b) A certified report of blood or tissue sampling which indicates by a ninety-nine and nine-tenths percentage point threshold probability that the alleged father is the father of the child creates a rebuttable presumption of paternity.
C. Any additional testing ordered by the court pursuant to this Part shall be proved by the testimony of the expert.
D. If the court finds that the conclusions of all the experts as disclosed by the reports, based upon the tests, are that the alleged father is not the father *718 of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence.
(Emphasis added.)[1]
Mr. Gibson argues that the paternity test results in this case did not meet the requirements of La. R.S. 9:397.3(A); therefore, the rebuttable presumption of paternity in (B)(2)(b) should not apply. Specifically, Mr. Gibson challenges the tests results on two grounds: (1) the certification by sworn affidavit as to the results is deficient in that it does not indicate that Dr. Sozer supervised the testing as required by the statute, nor was there any evidence that she personally performed the tests; and (2) the chain of custody of the evidence is deficient in that there is no verified documentation as to the actual collection of the samples. For these reasons, Mr. Gibson argues that the trial court should not have considered the test results as a “certified report” creating a rebuttable presumption of paternity under section B(2)(b) quoted above. We disagree.
| BFir3t, Mr. Gibson’s challenge to the certification of the test results is without merit. It is well-settled that the test results could have been admitted without expert testimony. State in the Interest of Braden v. Nash, 550 So.2d 866 (La.App. 2d Cir.1989), citing Worley v. Thirdkill, 506 So.2d 1288 (La.App. 2d Cir.1987) and State in the Interest of Bankston v. Davis, 521 So.2d 575 (La.App. 1st Cir.1988). If an expert does testify, however, he or she need not be the person who actually drew the blood, performed the tests or compiled the statistics for comparison. The expert may rely on data prepared by other technicians. Id., citing State v. Fallon, 290 So.2d 273 (La.1974); State v. Simien, 95-1407 (La.App. 3d Cir.7/24/96), 677 So.2d 1138; La. C.E. art. 703.
The Fairfax Identity Lab report contains the following certification made by Dr. Sozer:
I, the undersigned upon being duly sworn, depose and state I have analyzed the data on the biological specimens from the above-named individuals, that the report containing the results of said analysis has been prepared under my direct supervision, and that the facts and result therein are true and correct.
Moreover, while not required by the statute, Dr. Sozer personally testified at trial as an expert in paternity genetics/evaluations regarding the testing process and the test results. Dr. Sozer testified that she is the associate director of Fairfax Identity Laboratory as well as the custodian of records. She further testified that the specimens of Mr. Gibson, Ms. Atkins and J.J.A. were collected, packaged, sealed and mailed in accordance with the lab’s standard procedure. There was no evidence of tampering in the specimens. Dr. Sozer testified that her responsibilities include supervision of the laboratory and testing. Additionally, Dr. Sozer testified that, in this particular case, she saw the samples when they arrived at the laboratory in the tamper-resistant bags. Dr. Sozer further stated that she “monitored these tests very carefully.” She then reviewed all of the data on the samples prior to signing the report. We find no evidence of non-compliance with |fithe statute or jurisprudence interpreting the same with regard to the certification of the results by Dr. Sozer.
Likewise, we find no merit to Mr. Gibson’s challenge to the chain of custody of the samples. At the time of this trial, La. R.S. 9:397.2 provided as follows:
The chain of custody of blood or tissue samples taken under this Part may be established by affidavit if verified documentation of the chain of custody is submitted with the expert’s report and if such documentation was made at or near the time of the chain of custody and was *719 made in the course of regularly conducted business activity.[2]
In this case, we find that the record reveals an unbroken chain of custody beginning with the collection and packaging of the samples. We acknowledge that the affidavits which accompany the expert’s report indicate that the respective affiants “packaged and sealed” the samples and do not use the terms “drew or collected” the samples. We do not find this terminology to be fatal, however, to the chain of custody. Significantly, the “Identification Documents [3]” reveal that the same phlebotom-ists who actually drew or collected the samples from Mr. Gibson, Ms. Atkins and J.J.A. subsequently packaged and sealed the samples. Those same phlebotomists then signed, dated and notarized the affidavits of certification attached to Dr. Sozer’s report. As such, we find no deficiency in the chain of custody.

Burden of Proof

When the alleged parent is alive, the burden of proving paternity is by a preponderance of the evidence. La. C.C. art. 209(A); State in the Interest of Robinson v. Sims, 31,333 (La.App.2d Cir.10/28/98), 721 So.2d 90, writ denied, 98-2958 (La.1/8/99), 735 So.2d 640; State in the Interest of Vinson v. Smith, 29,464 (La.App.2d Cir.6/18/97), 697 So.2d 628; State, Department of Social Services v. Thomas, 27,248 (La.App.2d Cir.8/23/95), 660 So.2d 163; Litton v. Litton, 624 So.2d 472 (La.App. 2d Cir.1993), writ denied, 93-2657 (La.1/7/94), 631 So.2d 456; State v. Givens, 616 So.2d 259 (La.App. 2d Cir.1993). Simply stated, it must be shown that paternity by the defendant is more probable than not. State in the Interest of Robinson v. Sims, supra; State in the Interest of Vinson v. Smith, supra; State, Department of Social Services v. Thomas, supra. Proof of paternity is a factual question, and a trial court’s determination of the issue should not be disturbed absent a finding of manifest error. State in the Interest of Robinson v. Sims, supra; State in the Interest of Vinson v. Smith, supra; State, Department of Social Services v. Thomas, supra; Litton v. Litton, supra; State v. Smith, 605 So.2d 222 (La.App. 2d Cir.1992); State in the Interest of Ezell v. Evans, 600 So.2d 90 (La.App. 2d Cir.1992); State in the Interest of Lawrence v. Harrell, 582 So.2d 940 (La.App. 2d Cir.1991).
The purpose of blood analysis is either to exclude an accused male from the possibility of paternity, or, if an alleged father is not excluded, to calculate the odds that he would have passed the disclosed genetic markers to a particular child. State in the Interest of Robinson v. Sims, supra; State, Department of Social Services v. Thomas, supra; Litton v. Litton, supra; State v. Givens, supra. Although alone insufficient to prove paternity, scientific testing provides persuasive and objective evidence that can help establish paternity by a preponderance of the evidence. McKenzie v. Thomas, 95-2226 (La.App. 1st Cir.6/28/96), 678 So.2d 42, writ denied, 96-1855 (La.10/25/96), 681 So.2d 372.
1 «Mr. Gibson argues that, even if this court finds that the trial court properly considered the test results under La. R.S. 9:397.3, he presented sufficient evidence to rebut the presumption of paternity and the trial court erred in finding that Ms. Atkins satisfied the burden of proof of paternity. We disagree.
First, we point out that the results of the paternity test in this case, 99.99997 *720 percent probability of paternity and a combined paternity index of 351000, are strong indications that Mr. Gibson is J.J.A.’s biological father'. According to the testimony of Dr. Sozer, the probability that Mr. Gibson is J.J.A.’s biological father is 99.99 percent. Additionally, Dr. Sozer explained that the combined paternity index means that Mr. Gibson is 3,510,000 times more likely to be J.J.A.’s biological father than a randomly tested African-American male.
Mr. Gibson argues that his failure to exhibit the paternal obligatory fragment (one of eight genetic systems tested), is evidence of non-paternity; and, therefore, the test results are questionable. While it is true that lack of the fragment is some evidence of non-paternity, the written report of Dr. Sozer provides an explanation of such phenomenon; and she testified that this failure cannot be relied upon to exclude Mr. Gibson as the father.[4] In any event, Dr. Sozer’s report clearly indicates that Mr. Gibson’s failure to exhibit this fragment was taken into consideration when the final probability of paternity and combined paternity index were calculated.
Un addition to the test results, Mr. Gibson admitted having intercourse with Ms. Atkins in February, the month of conception. Ms. Atkins testified that she had sexual intercourse only with Mr. Gibson during that month. Further, Ms. Rougley testified that, during the time J.J.A. was conceived, Ms. Atkins was dating only Mr. Gibson and that Ms. Atkins never gave her any indication that J. J.A.’s father was anyone other than Mr. Gibson. The only evidence to the contrary was Mr. Gibson’s testimony that “he thought” Ms. Atkins was “seeing someone else” while the two were having sexual relations. On this record, we conclude that the trial court did not manifestly err in finding that the State proved paternity by a preponderance of the evidence.

CONCLUSION

For the foregoing reasons, the judgment of the trial court declaring Defendant, Ira L. Gibson, to be the natural and biological father of the minor child, J.J.A., is affirmed. Costs are assessed to Ira L. Gibson.
AFFIRMED.

. Section B(2)(b) was added by the legislature in 1995. 1995 La. Acts No. 1144, § 1.

. In 1999, this section was amended, deleting "by affidavit” following "under this Part may be established” and deleting "verified” preceding "documentation of the chain of custody.” Acts 1999, No. 1127, § 1.

. An "Identification Document” is prepared on each participant in the testing procedure. The document contains the participant’s personal data as well as the signature of the phlebotomist collecting the specimen for testing and the date and time of collection. The document is also signed by the individual from whom the specimen is collected.

. Dr. Sozer testified that, in order to exclude a tested male as a child’s biological father, that male must fail to exhibit at least two genetic characteristics necessary to be the biological father. If the tested male fails to exhibit only one of the genetic characteristics, as in this case, the male cannot be excluded as the father according to American Association of Blood Banks standards. In such case, a report is issued incorporating a mutation frequency, or how common or rare such mutations are in the population; and an explanatory addendum is attached to the report. In the case sub judice, the addendum to the written test results signed by Dr. Sozer indicates that the failure to exhibit the obligatory fragment can be explained in either of two ways: (1) the alleged father is not the true biological father of the child, but demonstrated the obligatory paternal fragment in seven out of eight systems by chance or (2) the alleged father is the true biological father and was excluded in one of eight systems due to a mutational event during spermatogenesis. Such mutations are a real and measurable phenomenon with a frequency of occurrence estimated at .01 to .7 percent.